**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————————

No. 17-1091

————————

JOSEPH A. AMES,
                                        Appellant

v.

AMERICAN RADIO RELAY LEAGUE, INC.;
TOM GALLAGHER; RICK RODERICK; DR. JAMES BOEHNER

————————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-16-cv-03660)
District Judge: Hon. C. Darnell Jones, II

————————

Submitted Under Third Circuit L.A.R. 34.1(a)
October 11, 2017

————————

Before: HARDIMAN, SHWARTZ, and ROTH, <u>Circuit Judges</u>.

(Opinion Filed:  November 13, 2017)

————————

OPINION[*]

————————

SHWARTZ, <u>Circuit Judge</u>.

———————————

   [*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7
does not constitute binding precedent.

Joseph Ames sued the American Radio Relay League, Inc. ("ARRL") and three of its officers (collectively, "Defendants") for defamation. The District Court dismissed his claim. For the reasons set forth below, we will affirm.

I[1]

ARRL is the national association for amateur radio operators. ARRL sponsors the National Traffic System ("NTS") program, which provides radio communication services to government agencies and other organizations, particularly during emergencies. NTS is comprised of three regional sections: the Eastern, Central, and Pacific Areas. Ames served as the Chairman of NTS's Eastern Area and the Eastern Pennsylvania Section Manager.

While serving in these roles, Ames had several communications with the Federal Emergency Management Agency ("FEMA"). In May 2015, Ames received an email from a FEMA representative, who inquired about using NTS and ARRL resources to provide communications support during a potential catastrophic event. Ames told FEMA about the communication services NTS could provide. In July 2015, Ames and another NTS member sent a letter to FEMA on behalf of NTS, stating, among other things, that (1) NTS would arrange a "table top exercise" with FEMA, and (2) NTS wanted to expand the existing "memorandum of agreement" between ARRL and FEMA to create an

---

[1] The following facts are taken from the complaint, assumed true, and construed in the light most favorable to Ames. Phillips v. Cty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008). This section also refers to certain other "indisputably authentic documents" related to the complaint, which may be properly considered when evaluating a motion to dismiss. Spruill v. Gillis, 372 F.3d 218, 223 (3d Cir. 2004).

additional memorandum of agreement between NTS and FEMA that would establish a direct relationship between NTS and FEMA and create guidelines concerning NTS's support of FEMA's activities.  App. 51.

In August 2015, ARRL's Chief Executive Officer ("CEO") David Sumner sent a letter to Ames and others ("the August 2015 letter").  The August 2015 letter indicated, among other things, that (1) under the ARRL bylaws, ARRL's President (with assistance from the CEO) is responsible for representing ARRL in its relationships with government agencies and is the official spokesperson regarding ARRL policy; (2) pursuant to the ARRL Board of Directors' ("the Board") policy statement, the CEO is responsible for contacts made by staff members in the performance of their duties and may authorize individuals to communicate with the federal government, but "the extent of contact authorized will be determined by the terms of reference"; (3) the Board's policy applies to communications with all government agencies, including FEMA, made on behalf of ARRL or any of its programs; (4) communications not in accordance with the Board's policy, including Ames's July 2015 letter, are unauthorized; (5) ARRL's designated point of contact for the memorandum of agreement between FEMA and ARRL is Mike Corey, and, "[u]nless otherwise authorized by [ARRL's President], any communication with FEMA pertaining to the [NTS] and any other ARRL programs is to be conducted only through Mr. Corey."  App. 108-09.

After receiving the August 2015 letter, Ames continued to communicate with FEMA.  In October 2015, Ames emailed Sumner and indicated that he received a phone call from a FEMA representative, who asked whether NTS would assist in a potential

3

FEMA response to an impending hurricane, and Ames told the FEMA representative that NTS was willing to help however it could. Sumner responded, "Joe, thanks for putting us all in the loop." App. 76. In February 2016, Ames sent an email to a FEMA representative, which stated that: (1) NTS would accept FEMA's invitation to participate in an upcoming exercise entitled "Cascadia Rising"; (2) NTS team members would supervise NTS participation in the event and lead on-site planning, preparation, and operations; (3) Ames could serve as a liaison for NTS; (4) Corey was ARRL's point of contact for FEMA; and (5) NTS would brief its managers and begin to plan its participation in the event. Ames also sent the email to Corey and Sumner. Corey responded, "[t]hanks for the update" and asked that NTS coordinate with other staff members who were involved in the exercise. App. 78. Sumner responded, "Joe, thanks for keeping us in the loop." App. 77.

In June 2016, Ames received a letter from ARRL, notifying him that it had voted to cancel all of his appointments, thereby removing him from his positions as Eastern Area Chairman for NTS and Eastern Pennsylvania Section Manager. The letter explained that ARRL was taking these actions because: (1) Ames treated NTS like a separate entity from ARRL by making decisions on policy issues, issuing press releases, doing government advocacy, and giving NTS volunteers the false impression that NTS is separate from ARRL, as most recently reflected in connection with the Cascadia Rising exercise; and (2) Sumner had warned Ames that he had no authority to contact or negotiate with FEMA, yet Ames continued to make commitments on behalf of NTS to

4

FEMA without authorization, and sought to cultivate a unique relationship between NTS and FEMA.

Shortly thereafter, ARRL published an article ("the Article") on its website entitled "ARRL Executive Committee Removes NTS Eastern Area Chair, Eastern Pennsylvania Section Manager." App. 52. The Article stated that ARRL had removed Ames from his appointments within ARRL because "Ames unilaterally and repeatedly communicated with officials of [FEMA] on behalf of NTS, making commitments on behalf of ARRL without authority . . . in violation of the rules and regulations of the ARRL Field Organization" and that "Ames repeatedly acted contrary to [the August 2015] directive," which stated that, unless otherwise authorized by ARRL, any communication with FEMA regarding NTS had to go through ARRL's authorized representatives. App. 52. The Article was shared with ARRL's "165,000 members worldwide" and was "reprinted and rebroadcasted by numerous third parties." App. 34.

In July 2016, Ames filed a complaint against Defendants in the United States District Court for the Eastern District of Pennsylvania, asserting a claim for defamation based on Defendants' publication of the Article. The District Court dismissed the complaint, concluding that Ames could not maintain a claim for defamation because the statements in the Article were true on the face of the complaint and therefore not defamatory as a matter of law. Ames appeals.

II[2]

---

[2] The District Court had jurisdiction under 28 U.S.C. § 1332. We have jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over a district court's order

5

Truth is an affirmative defense to a defamation claim under Pennsylvania law.[3] Tucker v. Fischbein, 237 F.3d 275, 287 (3d Cir. 2001); Bobb v. Kraybill, 511 A.2d 1379, 1380 (Pa. Super. Ct. 1986); see also 42 Pa. Cons. Stat. § 8343(b)(1). "While ordinarily a party may not raise affirmative defenses at the motion to dismiss stage, it may do so if the defense is apparent on the face of the complaint." Budhun v. Reading Hosp. & Med. Ctr., 765 F.3d 245, 259 (3d Cir. 2014) (citation omitted). Therefore, because we are reviewing an order dismissing a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), we will consider whether the allegedly defamatory statements are true on the face of the complaint, which includes consideration of both the allegations in the complaint and undisputedly authentic documents referenced therein or integral to the complaint. See Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006); Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 559-60 (3d Cir. 2002); see also Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir. 2014) ("[A] document integral to or

---

granting a motion to dismiss. Burtch v. Milberg Factors, Inc., 662 F.3d 212, 220 (3d Cir. 2011). We must determine whether the complaint, construed "in the light most favorable to the plaintiff," Santomenno ex rel. John Hancock Tr. v. John Hancock Life Ins. Co., 768 F.3d 284, 290 (3d Cir. 2014) (citation omitted), "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)), "but we disregard rote recitals of the elements of a cause of action, legal conclusions, and mere conclusory statements," James v. City of Wilkes-Barre, 700 F.3d 675, 679 (3d Cir. 2012). A claim "has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Thompson v. Real Estate Mortg. Network, 748 F.3d 142, 147 (3d Cir. 2014) (citation omitted).

[3] Neither party has challenged the applicability of Pennsylvania law.

explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment." (emphasis and citation omitted)).

Ames alleges that the statement in the Article that "Ames unilaterally . . . communicated with officials of [FEMA] on behalf of NTS" is defamatory. App. 43 (first alteration in original). This statement covers two things: whether Ames communicated with FEMA and whether he did so unilaterally. The record shows he did both and thus the statement is true. In May 2015, Ames responded via email to an inquiry from a FEMA representative and explained several different technologies that would enable NTS to send communications in an emergency situation. In July 2015, Ames sent a letter to FEMA on behalf of NTS, discussing "direct cooperation" between FEMA and NTS and the possibility of entering into a formal memorandum of understanding between NTS and FEMA. App. 51. In October 2015, Ames spoke with a FEMA representative and told him that NTS would be willing to help with an impending hurricane. In February 2016, Ames sent an email to a FEMA representative on behalf of NTS, accepting FEMA's invitation to participate in the Cascadia Rising exercise. Therefore, the complaint and documents related to events referred to therein show that Ames communicated with FEMA on behalf of NTS, including twice after the August 2015 directive that all communications with FEMA should go through Corey.

Moreover, the record shows these communications were not authorized by ARRL and thus unilateral. Ames claims that the communications were not unilateral and were authorized because he "looped in" ARRL leadership on these communications and Sumner and Corey thanked him for doing so. While ARRL leadership apparently did not

7

object to his emails to FEMA, this does not indicate that the ARRL leadership approved of his communications. Ames informed ARRL leadership of his communications after they had been sent. More importantly, their failure to object does not change the fact that Ames has not alleged that he received approval from Corey or the ARRL president before sending the communications despite the August 2015 directive requiring that any communications with FEMA with respect to NTS were to go through Corey. Therefore, the statement that Ames communicated unilaterally with FEMA on behalf of NTS is true and cannot support a defamation claim.[4]

Ames also alleges that the Article's statement that "Ames . . . repeatedly communicated with officials of [FEMA] on behalf of NTS, making commitments on behalf of ARRL without authority" is defamatory. App. 43 (first alteration in original). The face of the complaint and associated documents, however, show that the statement is true. Ames had several communications with FEMA in which he made commitments without authority, including his: (1) July 2015 letter to FEMA, in which he committed "to develop direct cooperation between FEMA and the NTS," to "work with FEMA to develop standard guidelines" regarding their relationship, to arrange a table top exercise

---

[4] Ames also mentions that, following the August 2015 letter, he received a certificate from ARRL acknowledging that he was a member of the ARRL A-1 Operator Club and was authorized to nominate others for membership, and argues that this shows that ARRL was satisfied with Ames's work, even though he had communications with FEMA. The certificate, however, is irrelevant because it predates Ames's October 2015 and February 2016 communications with FEMA, and thus could not show approval for those contacts with FEMA. Moreover, the certificate shows only that he had the authority to nominate members and makes no mention of any other authority being vested in him.

8

with FEMA, and to develop a formal memorandum of understanding between FEMA and NTS, App. 51; (2) October 2015 email showing that, during a phone conversation with a FEMA representative, he had agreed that NTS would help FEMA in its response to an impending hurricane; and (3) February 2016 email to a FEMA representative, committing NTS to attend the Cascadia Rising exercise and assigning tasks to NTS members to assist with the event. Each of these documents show Ames made commitments to FEMA on behalf of ARRL's NTS program. Their text contradicts Ames's argument that he merely informed FEMA of NTS's communication abilities and made no commitments. Finally, as reflected in the August 2015 letter, Ames was not authorized to communicate with FEMA without prior approval, and he does not allege that he obtained such approval. Therefore, the statement that Ames "repeatedly communicated" with FEMA on behalf of NTS and made commitments on behalf of ARRL without authority is true and cannot support a claim for defamation.

Ames also cannot base a defamation claim on the Article's statement that he "repeatedly acted contrary to Sumner's [August 2015] directive," App. 43, because the record shows the statement was true. The August 2015 letter explicitly stated that any communication with FEMA pertaining to NTS, unless otherwise authorized by ARRL's president, "is to be conducted only through Mr. Corey." App. 109. Despite this directive, Ames communicated with FEMA in October 2015 and February 2016. Ames has not alleged that he received approval from ARRL's president or from Corey before making these communications, and Ames's argument that he received authorization after-the-fact because ARRL leadership did not object to the communications does not show

9

the communications were authorized when they occurred. Therefore, because the record shows that Ames acted contrary to the August 2015 directive on at least two occasions, the statement that Ames "repeatedly acted contrary" to the directive is true and cannot support a claim for defamation.

In summary, it is apparent on the face of the complaint and related documents that the statements in the Article are true, and the District Court therefore correctly held that the Defendants established a complete defense to Ames's defamation claim and appropriately dismissed the complaint.

III

For the foregoing reasons, we will affirm the order of the District Court.