NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-1091
_____

MD TUSER EMRAN
a/k/a
EMRAN MD TUSER,
                    Petitioner
v.

ATTORNEY GENERAL UNITED STATES OF AMERICA


_____

On Petition for Review of an Order of the Board of Immigration Appeals
(Agency No. A216-052-024)
Immigration Judge: Daniel A. Morris
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
October 4, 2019

Before: SHWARTZ, SCIRICA, and FUENTES, *Circuit Judges*.

(Filed: February 13, 2020)
_____

OPINION[**]
_____

_____

[**] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

FUENTES, *Circuit Judge*.

Petitioner Md Tuser Emran, also known as Emran Md Tuser, seeks review of an order of the Board of Immigration Appeals ("BIA") dismissing the appeal, and in effect affirming an Immigration Judge's ("IJ") decision to deny his applications for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). For the following reasons, we will deny the petition for review.

## I.

Emran is a native and citizen of Bangladesh. In September 2013, Emran was admitted to the United States on a nonimmigrant F-1 student visa. Emran later fell out of status by failing to attend school and working without authorization. Emran returned to Bangladesh in July 2017. A short time later, he returned to the United States and applied for re-admission in New York without valid entry documents. The Department of Homeland Security ("DHS") served Emran with a Notice to Appear charging him with removability under 8 U.S.C. §1182(a)(7)(A)(i)(I) as an applicant for admission into the United States without valid entry documents. DHS later added charges of removability under 8 U.S.C. §§ 1182(a)(6)(G) and 1182(a)(9)(B)(i)(II). In October 2017, Emran applied for asylum, withholding of removal, and CAT protection based on his political opinion.

In support of his applications, Emran testified that he joined the Liberal Democratic Party ("LDP") in Bangladesh, eventually becoming president of the student wing. One day, members of a political party called the Awami League ("AL") approached Emran and tried to convince him to join their party. When Emran declined,

2

he claims he was beaten and his family was threatened. After escaping, Emran moved out of his residence and into a college hostel.

Emran further testified that a few years later, members of the AL searched for him at his family's home. When the AL did not find Emran, they vandalized his home and physically assaulted and kidnapped his brother. The men held Emran's brother for seven days until his family sold half of their land and paid the ransom. After that incident, Emran lived in hiding in various locations. Nevertheless, on another occasion, individuals from the AL vandalized Emran's garment store and forced the store manager to call Emran to set up a meeting. Emran waited for the store manager, but instead, members of the AL showed up and beat Emran again. He spent two days in the emergency room, and afterwards moved to Comilla, another city in Bangladesh.

Finally, Emran testified that while living in Comilla, he was falsely accused of throwing bricks and explosives at police during a political rally, and he blamed the police and members of the AL for his arrest. Eventually, Emran was released on bond and ordered to appear at a future date. He failed to appear because he received threats and was convicted in absentia. Emran successfully appealed his conviction, and the court ordered police to ensure the safety of Emran and his family. Emran then appeared in court, and his conviction was overturned.

After reviewing Emran's testimony and documentary evidence, the IJ denied Emran's applications. In doing so, the IJ made an adverse credibility finding, citing inconsistencies in Emran's submitted affidavits and his testimony, such as his failure to disclose his previous arrest and corrected affidavits that pre-dated the date the IJ ordered

3

the documents corrected. The IJ also found that even if Emran was credible, he did not meet his burden to establish eligibility for relief.

As to Emran's asylum claim, the IJ found that even though the harm Emran experienced in Bangladesh may have been sufficiently severe to rise to the level of past persecution, Emran failed to establish past persecution committed by government actors or by private actors whom the government is unable or unwilling to control. While the IJ noted, assuming he was credible, Emran provided sufficient evidence to show that his political opinion is one central reason for the beatings he experienced, the Bangladeshi police complied with a court order to protect Emran from AL members, and Emran was eventually exonerated by the courts. Moreover, the IJ found insufficient evidence to support Emran's claim that he was persecuted by the government of Bangladesh because the government demonstrated a willingness to protect Emran from threats by private citizens, including members of the AL. Finally, because Emran failed to establish past persecution, the IJ held that he was not entitled to the presumption of a well-founded fear of future persecution.

As to Emran's withholding of removal claim, the IJ held that because Emran did not meet his burden of proving his eligibility for asylum, he also failed to establish that it is more likely than not he would be persecuted on account of a protected category for purposes of withholding of removal.

Regarding Emran's CAT application, the IJ found, after considering all of the evidence relevant to the possibility of future torture, Emran did not meet his burden to show that he would more likely than not be tortured in Bangladesh "by or at the

4

instigation of or with the consent or acquiescence of a public office or other person acting in an official capacity."[1] The IJ explained that, based on the record, Emran could avoid a future threat to his life by relocating outside of the area of Dhaka where he received threats from the group associated with the AL.

The BIA agreed with the IJ's reasoning and affirmed the IJ's decision. Emran timely filed this petition for review.

## II.

We have jurisdiction to review the BIA's decision under 8 U.S.C. § 1252(a). Where "the BIA adopts and affirms the decision of the IJ, as well as provides its own reasoning," we review both decisions.[2] We review factual findings—including findings relating to an alien's alleged fear of persecution and adverse credibility determinations—under the substantial evidence standard.[3]

## III.

Emran argues that substantial evidence does not support the denial of his applications for asylum, withholding of removal or CAT protection. We address each application in turn.

---

[1] App. 29 (quoting 8 C.F.R. § 1208.18(a)(1)).
[2] *Hashmi v. Att'y Gen.*, 531 F.3d 256, 259 (3d Cir. 2008).
[3] *See Sandie v. Att'y Gen.*, 562 F.3d 246, 251 (3d Cir. 2009); *see also Chen v. Ashcroft*, 376 F.3d 215, 222 (3d Cir. 2004); Emran argues that the BIA employed an "inappropriately stringent standard" when evaluating his testimony, and thus we should review the credibility determination *de novo*. Petitioner's Br. 14. We reject this argument as the BIA applied the correct standard in its evaluation. *See* 8 C.F.R. § 1003.1(d)(3)(i).

5

## A.

As an initial matter, we review the BIA's finding that there was no clear error in the IJ's adverse credibility finding.

There were several omissions and contradictions in Emran's testimony and documentary evidence that cannot be ignored. For example, when Emran was permitted additional time to translate statements from Bengali to English, the English translations bore attestation stamps that predated the Bengali originals, and Emran failed to offer a plausible explanation as to why. In another example, Emran failed to disclose his arrest to immigration officers when applying for his F-1 visa. This bears on his credibility because he contends, in part, that his arrest was persecution for his political opinion.

Other evidence submitted by Emran failed to rehabilitate these concerns. For example, two letters Emran submitted from his criminal attorney in Bangladesh contained contradictory statements, and medical records from the alleged attack by the AL on Emran's brother contradicted the date of the attack and the severity of the injury. Given the totality of the circumstances, we conclude that substantial evidence supports the conclusion that Emran's testimony and evidence was not credible.[4]

## B.

Second, we consider Emran's asylum claim. To qualify for asylum, Emran had to show that he was a "refugee" as defined in 8 U.S.C. § 1101(a)(42)(A). A refugee is someone who has suffered past persecution or has a well-founded fear of future

---

[4] *See* 8 U.S.C. § 1158(b)(1)(B)(iii).

6

persecution in his country on account of race, religion, nationality, membership in a particular social group, or political opinion, and is unable or unwilling to return to, or avail himself of the protection of, the country owing to such persecution.[5] Moreover, the persecution must be committed either by the government or by persons or an organization that the government is unable or unwilling to control.[6]

The BIA correctly determined that Emran failed to demonstrate a reasonable probability of future persecution on account of his political opinion in support of the LDP. To establish persecution based on political opinion, an alien must: 1) specify the political opinion on which he relies; 2) show that he holds that opinion; and 3) show that he has a well-founded fear of persecution based on that opinion.[7] As the BIA noted, the Bangladeshi court ordered the police to protect Emran from threats by private citizens and reopened his case, after which he was exonerated. As such, Emran failed to establish that the Bangladeshi government participated in, or was unwilling to protect him from, persecution or torture.

## C.

Next, we consider Emran's withholding of removal claim. Because Emran's asylum claim fails, his withholding of removal claim also fails.[8] To meet the standard for withholding of removal, Emran needed to establish by a "clear probability" that, if he

---

[5] 8 C.F.R. §§ 1208.13(b)(1), (2)(i)(A)-(C).
[6] *Matter of A-B*, 27 I&N Dec. 316, 337 (BIA 2018) (quoting *Matter of Acosta*, 19 I&N Dec. 211, 222 (BIA 1985)).
[7] *Fatin v. INS*, 12 F.3d 1233, 1242 (3d Cir. 1993).
[8] *Guo v. Ashcroft*, 386 F.3d 556, 561 n.4 (3d Cir. 2004).

7

returned to Bangladesh, his life or freedom "would be threatened" on account of his political opinion, which is more demanding than the standard governing eligibility for asylum.[9] As discussed above, Emran failed to establish that the government of Bangladesh is unwilling or unable to protect him, and in fact, the record shows that the government protected Emran in the past.

### D.

Finally, we consider Emran's CAT claim. For CAT protection, Emran had to demonstrate that if he were removed to Bangladesh, it is more likely than not that he would be tortured by or at the instigation of, or with the consent or acquiescence of, a public official.[10]

The record here does not compel the conclusion that Emran made such a showing. To the contrary, as discussed above, the government of Bangladesh has already demonstrated that it is willing and able to assist Emran. Both the police and the court system assisted and protected him at a time when the AL was the ruling party. This undercuts Emran's claim that "the relationship between the police and the [AL] satisfies the requirement of 'acquiescence.'"[11] Accordingly, we reject Emran's claims as they relate to CAT protection.

---

[9] *INS v. Cardoza-Fonesca*, 480 U.S. 421, 430-31 (1987); *see also* 8 U.S.C. § 1231(b)(3); *INS v. Stevic*, 467 U.S. 407, 429-30 (1984); *Valdiviezo-Galdamez v. Att'y Gen.*, 663 F.3d 582, 591 (3d Cir. 2011).
[10] *See* 8 C.F.R. §§ 1208.16(c)(2), 1208.18(a)(1).
[11] Petitioner's Br. at 33.

## IV.

For the foregoing reasons, we will deny the petition for review.